**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHSUETTS**

| | |
|---|---|
| MALCOLM WIENER,<br><br>Plaintiff,<br><br>v.<br><br>MIB GROUP, INC., and<br>JONATHAN SAGER<br><br>Defendants. | Civil Action No. 1:22-CV-10799-WGY<br><br>**LEAVE TO FILE GRANTED ON JULY 15, 2022** |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Malcom H. Wiener brings this complaint against MIB Group, Inc., and its employee Jonathan Sager due to their unauthorized and therefore unlawful disclosure of private information stored by MIB Group, Inc. concerning Mr. Wiener. This was a violation of Mr. Wiener's rights as a consumer under the Fair Credit Reporting Act.

**The Parties**

1. Plaintiff Malcolm H. Wiener ("Mr. Wiener") is a citizen of the United States and is a resident of Greenwich, Connecticut.

2. Defendant MIB Group, Inc. ("MIB") is a member-owned corporation headquartered in Braintree, Massachusetts and a consumer reporting agency under the federal Fair Credit Reporting Act.

3. Defendant Jonathan Sager was at all relevant times the Executive Vice President and General Counsel for MIB and resides in Duxbury, Massachusetts. At all times relevant hereto, Mr. Sager acted within the scope of his employment at MIB.

**Jury Trial Demand**

4. Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues so triable.

**Jurisdiction and Venue**

5. This action arises under the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681–1681x. This Court has subject-matter jurisdiction over Mr. Wiener's federal claims under 28 U.S.C. §1331.

6. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b) because both Defendants are residents of Massachusetts.

**Facts**

7. Mr. Wiener was born on July 3, 1935.

8. In 1986, at age 51, Mr. Wiener purchased his first premium universal life insurance policy from AXA Equitable Life Insurance Company ("AXA"). Over the next year, Mr. Wiener purchased two other multi-million-dollar policies from AXA, bringing the total death benefit, as of 2013, to $16 million under his three policies.

9. By their terms, all policies were to stay in effect throughout Mr. Wiener's life if the policy conditions were met.

10. In 2008, following an error or oversight which resulted in non-payment of policy premium, one of Mr. Wiener's policies was terminated. Mr. Wiener timely submitted a reinstatement application, which AXA approved after a medical review in that year. This terminated policy was thus reinstated by AXA.

11. On about December 2, 2013, following another payment error or oversight, AXA sent Mr. Wiener a notice of policy termination for all three policies and an accompanying application for reinstatement. The application required Mr. Wiener to submit medical

information to "[p]rovide a preliminary indication of [his] insurability." He submitted the application with the requested medical information.

12. On March 24, 2014, AXA notified Mr. Wiener that—despite no material change in his health since 2008—it had declined his application for reinstatement, citing its "evaluation of specific items of information obtained from you in your application, or supplements to the application statements: specifically, information received from Dr. Barry Boyd," Mr. Wiener's physician.

<u>AXA Misrepresents Mr. Wiener's Medical Status to MIB.</u>

13. Plaintiff subsequently learned that Mr. Wiener's December 2013 reinstatement application and medical information had been evaluated by AXA underwriter Hallie Hodgins (then Hawkins). During the underwriting process, Ms. Hodgins falsely and negligently concluded that Mr. Wiener had suffered a suspected stroke and had sleep apnea, cognitive impairment, and a precancerous medical condition called MGUS. These conclusions were false and were not supported by Mr. Wiener's medical information.

14. As a result of this negligent and erroneous underwriting, AXA submitted a false and erroneous report to MIB of the basis for AXA's decision to decline to reinstate Mr. Wiener's policies. Thus, the MIB database reflected false information concerning Mr. Wiener's medical history.

<u>MIB's Processes and Policies</u>

15. MIB collects and maintains information supplied to it from member companies about the medical conditions of individual applicants, and it makes this information available to

member companies who receive an authorized release from the individual to whom the information pertains.

16. MIB also collects other personal information concerning applicants, including which member companies have reviewed or queried an MIB file on a particular individual.

17. All of the information MIB collects and maintains regarding individual insurance applicants is collected and maintained to facilitate review and underwriting by its member companies. Thus, any and all information MIB collects qualifies as a consumer report under the Fair Credit Reporting Act ("FCRA") whenever it is shared with member companies.

18. Upon information and belief, member companies may either review or make a formal query of a consumer's MIB file, but only upon receipt of an executed authorization from the consumer under MIB policies for either type of access.

19. Medical information within MIB's databases is catalogued using proprietary "codes" designed to protect the consumer's privacy. When a life insurer reports medical conditions to MIB, the insurer also selects the MIB codes that are applicable.

20. Member companies with a consumer authorization may see not only the MIB codes but also which member company supplied the information.

21. The MIB file for a consumer also discloses whether, and if so which, insurers have formally queried the file and, in some cases, which insurers have made less formal reviews. Upon information and belief, this information, like medical information, is accessible to member companies, but pursuant to MIB policies and applicable law, all MIB information is only available to a member following receipt of a signed authorization from the consumer to which it

pertains and the consumer's information is generally maintained in order to facilitate insurer underwriting.

MIB's Maintenance of Inaccurate Information Reported By AXA

22. As a result of Ms. Hodgins' entry of misinformation into the MIB database and selection of medical codes for conditions which Mr. Wiener did not have, any MIB member to which Mr. Wiener applied for a life insurance policy would receive or view four erroneously documented MIB codes corresponding to serious medical conditions that Mr. Wiener ***did not have***. These conditions, had they truly existed as a member company would be led to believe from the MIB information, would render him unable to obtain life insurance at the appropriate rate for his true health status.

23. On August 30, 2017, Mr. Wiener learned of the false report submitted by AXA to MIB which identified four serious medical conditions as the basis for AXA's decision to decline his reinstatement application, conditions which Mr. Wiener ***did not have***.

Defendants' Unauthorized Disclosure of Information Maintained by MIB to AXA.

24. Mr. Wiener filed a complaint against AXA in North Carolina state court on January 24, 2018 which was later removed to federal court.

25. The court held a three-day trial from September 8 to September 10, 2020. The jury returned a verdict in favor of Mr. Wiener.[1]

[1] The District Court then dismissed the action on a post-trial motion based on the alleged lack of subject matter jurisdiction. Mr. Wiener has appealed the dismissal. His appeal is currently pending before the U.S. Court of Appeals for the Fourth Circuit (Case No. 21-2165).

26. After discovery concluded but before trial, on June 22, 2020, AXA obtained information from Mr. Sager at least some of which was ultimately documented in a sworn affidavit (the "Sager Affidavit").

27. Mr. Sager provided information to AXA voluntarily and not pursuant to any Court or other compelled process. Upon information and belief, AXA chose to then reduce selected information helpful to its case to an affidavit which it requested Mr. Sager to sign in support of a dispositive motion, and he did so.

28. Neither Mr. Sager nor MIB had any signed authorization from Mr. Wiener authorizing a review or inquiry of his MIB information by anyone or disclosure of information to AXA.

29. In his affidavit, Mr. Sager stated that MIB rules require life insurance applicants to submit signed authorizations before a member-company can access that applicant's MIB file. Further, the inquiring member-company cannot submit an "inquiry" to MIB without the applicant's signed authorization. A copy of the affidavit is attached hereto as Exhibit A.

30. Mr. Sager nonetheless voluntarily disclosed to AXA information from an "extended activity file" that MIB had maintained on Mr. Wiener going back to 1995, information that Mr. Wiener had not authorized AXA to obtain or MIB to disclose. At least some of the disclosed information was reflected in Mr. Sager's affidavit.

31. On September 9, 2020, AXA called Mr. Sager as its witness at the trial. Mr. Sager testified to the information he had shared with AXA as reflected in his affidavit.

32. AXA's counsel asked if Mr. Sager had ever been "asked to do a search of MIB's files to determine whether or not any insurance company has ever requested information about Malcolm Wiener." Mr. Sager responded that he "took that upon myself on my own initiative…

knowing that there was some controversy." Relevant excerpts of Mr. Sager's testimony at the trial are attached at Exhibit B. Thus, Mr. Sager's disclosure of information to AXA was not pursuant to any policy of MIB nor lawful, inasmuch as it revealed protected information of Mr. Wiener that Mr. Sager had no authority to access or to disclose.

33. Mr. Sager then testified at trial as to the contents of Mr. Wiener's MIB files. His testimony revealed the same protected information that Mr. Sager previously disclosed voluntarily without authorization from the consumer, Mr. Wiener, to AXA. *Id.*

34. Mr. Sager was then cross-examined by Mr. Wiener's counsel. Under cross-examination, Mr. Sager reiterated that he undertook the search of Mr. Wiener's protected consumer information contained in his MIB file "on [his] own volition." He also confirmed his report to AXA, namely that he could find "no record of inquiries" other than AXA's and RGA's (AXA's independent reinsurer of one of Mr. Wiener's policies) into Mr. Wiener's MIB file. *Id.*

35. Upon information and belief, AXA requested MIB to review its records and report to AXA whether any other member companies had accessed Mr. Wiener's MIB records in order to defend itself in Mr. Wiener's suit against AXA, without any authorization from Mr. Wiener. It seems highly unlikely that Mr. Sager would have done this search out of curiosity. Regardless of the reason, without question, Mr. Sager had no legitimate reason or authorization to query Mr. Wiener's MIB record or to provide information within MIB to AXA.

36. The voluntary disclosure of information from Mr. Wiener's MIB file to AXA, at least some of which was ultimately recorded in the Sager Affidavit, was a violation of the FCRA and MIB rules by both MIB and Mr. Sager. Further it was not done for a proper purpose under the FCRA, namely, in connection with the potential extension of credit or issuance of insurance to a consumer. Rather, Mr. Sager's voluntarily disclosure was made to assist a member company

defend itself in litigation.

37. Indeed, Mr. Sager testified at trial that the MIB rules ***prohibit*** unauthorized search requests for the contents of an individual's MIB file. Mr. Sager identified no authorization AXA had at the time he voluntarily disclosed MIB file contents concerning Mr. Wiener to AXA. *See* Exhibit B (trial testimony).

38. Mr. Sager disclosed no authorization he had from Mr. Wiener or any agent purporting to represent Mr. Wiener to disclose Mr. Wiener's MIB file. Further, Mr. Sager confirmed that he was not under any compulsion, including from court order or subpoena, to reveal the contents of Mr. Wiener's file. *Id.*

39. Mr. Sager testified that he was unaware of any existing policy-holder relationship between Mr. Wiener and AXA (which had in fact terminated as of 2013 over 6 years before the unauthorized disclosure) when Mr. Sager made his disclosure to AXA. At no time before making the disclosure did Mr. Sager try to determine if a policy-holder relationship or other authorization existed (as it did not). *Id.* Thus, Mr. Sager plainly knew, or was reckless in not knowing, that his disclosure of consumer report information concerning Mr. Wiener to AXA violated MIB policies as well as the law.

40. Mr. Sager's disclosure was not for one of the permissible purposes listed in 15 U.S.C. § 1681b(a)(3); therefore, it was a prohibited disclosure of a consumer report.

41. Mr. Sager's disclosure of information from Mr. Wiener's MIB file was also in violation of 15 U.S.C. § 1681r.

42. At all times in connection with these disclosures, including in connection with his voluntary supply of an affidavit under oath in pending litigation involving Mr. Wiener and AXA, Mr. Sager was acting within the scope of his employment for MIB. At a minimum, he was acting

with apparent authority, particularly in submitting an affidavit and testifying at a trial while he was General Counsel of MIB. Thus, MIB is responsible for Mr. Sager's unauthorized and unlawful disclosure.

43. The voluntary disclosure of Plaintiff's private, consumer report information to AXA was after discovery had concluded in the underlying action, thus Plaintiff incurred attorney's fees and costs associated with having to respond to information in the litigation that should never have been disclosed and without the typical discovery methods that should have been available to him. This placed Plaintiff at a substantial disadvantage in the litigation and caused not only financial harm but distress as well.

**Count I**

**(15 U.S.C. § 1681n)**

44. The allegations above are realleged.

45. MIB is a consumer reporting agency under FCRA and holds itself out as such on its public website, referring to itself as "a nationwide specialty consumer reporting agency under the federal Fair Credit Reporting Act (FCRA)…." MIB qualifies as a consumer reporting agency under § 1681a(f).

46. All of the information MIB collects and maintains on consumers is expected to be used by member companies to determine consumers' eligibility for insurance, thus when shared, any and all MIB information is a consumer report as defined under the FCRA.

47. The FCRA limits the circumstances under which MIB, as a consumer reporting agency, may furnish a consumer report.

48. The FCRA also provides that officers and employees of a credit reporting agency may not "knowingly and willfully provide[] information concerning an individual from the agency's files to a person not authorized to receive that information…." 15 U.S.C. § 1681r.

49. The "information" protected under 15 U.S.C. § 1681r consists of all information concerning Mr. Wiener contained in MIB's files.

50. Section 1681n of the FCRA provides that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer." 15 U.S.C. § 1681n. "Person" is defined to include a "corporation" such as MIB as well as an individual, such as Mr. Sager. 15 U.S.C. § 1681(a)(b).

51. Among the "requirements" imposed under the FCRA are the obligations on officers and employees, like Mr. Sager, as set out in § 1681r.

52. Mr. Sager's testimony under oath demonstrates that he, acting in his capacity as an officer of MIB, knowingly and willfully provided information from Mr. Wiener's MIB file to AXA under circumstances where AXA was not authorized to receive it, as prohibited by § 1681r. Mr. Sager, as general counsel, knew that the disclosure was prohibited by MIB rules and the law; his disclosure to aid an MIB member was knowing and willful.

53. Mr. Sager's actions were taken on behalf of MIB, or at a minimum with apparent authority, as a result MIB also willfully failed to comply with the requirements of the FCRA and/or is liable under § 1681n.

54. As a result of this disclosure, Mr. Wiener has been harmed by Defendants in an amount to be determined at trial or is, at a minimum, entitled to statutory relief including nominal damages and attorney's fees and costs.

**Count II**

**(15 U.S.C. § 1681o)**

55. The allegations above are realleged.

56. Section 1681o of the FCRA provides that "[a]ny person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer." 15 U.S.C. § 1681o.

57. As general counsel, Mr. Sager knew or should have known that providing any information from a consumer's MIB file without prior authorization was a violation of, at a minimum, § 1681r.

58. Mr. Sager's testimony under oath demonstrates that, acting in his capacity as an officer of the MIB and/or acting with apparent authority of MIB, he at a minimum negligently provided information from Mr. Wiener's MIB file to AXA. Neither Mr. Sager nor MIB were authorized to share any information from Mr. Wiener's MIB file, and this disclosure was in violation of the FCRA.

59. As a result of this disclosure, Mr. Wiener has been harmed by Defendants in an amount to be determined at trial or is, at a minimum, entitled to statutory relief including nominal damages and attorney's fees and costs.

WHEREFORE, Plaintiff requests that the Court enter Judgment for Plaintiff and award the following relief:

A. Enter a declaration that Mr. Sager and/or MIB violated 15 U.S.C. §§ 1861r and 1861n under Count I, and/or a declaration that Mr. Sager and/or MIB violated 15 U.S.C. § 1860o under Count II;

B. Enter an injunction that Mr. Sager and MIB may not make any further unauthorized disclosures of Mr. Wiener's MIB information;

C. Award Plaintiff damages against both Defendants in an amount to be determined at trial or, at a minimum, award statutory damages;

D. Award Plaintiff his attorney's fees and costs; and

E. Enter such other relief as the Court deems just and equitable.

Respectfully submitted,

MALCOLM WIENER,

By his attorneys,

*/s/ Megan C. Deluhery*
Megan C. Deluhery (BBO# 655564)
TODD & WELD LLP
One Federal Street
Boston, MA 02110
(617) 720-2626
mdeluhery@toddweld.com

Carolyn T. Seely
66 Vista Drive
Greenwich, CT 06830
(203) 661-9702
cswiener@yahoo.com
*Pro hac vice application pending*

Dated: July 15, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 15, 2022.

*/s/ Megan C. Deluhery*
Megan C. Deluhery